FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

00 JAN 19 AM 9:28

U.S. DISTRICT COURT
N.D. OF ALABAMA

SANDRA F. CLAYTON, )
)
Plaintiffs, )
)
v. ) CIVIL ACTION NO. 97-PWG-2215-S
)
BELLSOUTH TELECOMMUNICATIONS, INC., )
and COMMUNICATION WORKERS OF )
AMERICA, )
)
Defendants. )

ENTERED

JAN 19 2000

## MEMORANDUM OF OPINION

Plaintiff, a former employee of defendant BellSouth Telecommunications, Inc. ("BellSouth"), has sued BellSouth and Communication Workers of America, Inc. ("CWA") under the Americans with Disabilities Act, 42 U.S.C. §§ 12101-12213, the Age Discrimination in Employment Act, 28 U.S.C. §§ 621-634 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* This matter is before the court on the motions for summary judgment filed by BellSouth (document #21) and CWA (document #23).[1] The litigation is before the magistrate judge pursuant to 28 U.S.C. § 636(c).

## STANDARD OF REVIEW

Summary judgment is appropriate only if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Rule 56, *Federal Rules of Civil Procedure.* In making that assessment, the court must view the evidence in a light most favorable

---

[1] Although defendants' motions for summary judgment were filed on September 2, 1998 as required by the scheduling order by defendants, plaintiff contributed substantially to the delay in the court's consideration of the motions for summary judgment by requesting extensions of time to respond to the motions and further by filing notices of filing affidavits on February 22, 1999 and March 10, 1999 which in turn necessitated responses by defendants.

to the non-moving party and must draw all reasonable inferences against the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). The burden of proof is upon the moving party to establish his prima facie entitlement to summary judgment by showing the absence of genuine issues and that he is due to prevail as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991). Once that initial burden has been carried, however, the non-moving party may not merely rest upon his pleading, but must come forward with evidence supporting each essential element of his claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Barfield v. Brierton*, 883 F.2d 923 (11th Cir. 1989). Unless the plaintiff, who carries the ultimate burden of proving his action, is able to show some evidence with respect to each element of his claim, all other issues of fact become immaterial and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Bennett v. Parker*, 898 F.2d 1530 (11th Cir. 1990). As the Eleventh Circuit has explained:

> Facts in dispute cease to be "material" facts when the plaintiff fails to establish a prima facie case. "In such a situation, there can be `no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." [Citation omitted]. Thus, under such circumstances, the public official is entitled to judgment as a matter of law, because the plaintiff has failed to carry the burden of proof. This rule facilitates the dismissal of factually unsupported claims prior to trial.

898 F.2d at 1532.

STATEMENT OF RELEVANT UNDISPUTED FACTS

Plaintiff Sandra Clayton (hereinafter "Clayton") was hired in September 1977 and worked in various positions until July 8, 1996. Mrs. Clayton was a member of Communications Workers of American Local 3902 (hereinafter "CWA"). (Clayton June 23, 1998 Depo, p.104.). Mrs. Clayton worked for BellSouth in numerous data processing positions involving key punch and data entry during her career with BellSouth. (Clayton June 23, 1998 Depo, p.15).

Defendant CWA is a labor organization. CWA is the exclusive collective bargaining representative of certain employees of BellSouth Telecommunications (hereinafter "BellSouth" or "Company"), including employees in the Birmingham, Alabama area. BellSouth and CWA have been party to a series of successive collective bargaining agreements (hereinafter the "agreement") governing terms and conditions of employment for BellSouth employees, including a collective bargaining agreement effective August 6, 1995. (Affidavit of Terry Davis, ¶ 2; Deposition of Jack Baccari–hereinafter "Baccari Depo," p.52 and Ex. 1 thereto).

Among the terms and conditions of the 1995 contract are procedures for processing and arbitrating employee grievances. The role of a CWA local union in the grievance procedure is limited to steps one and two. When the grievance reaches step three of the procedure, the CWA National Union and its representatives assume responsibility for further processing of the grievance, including arbitration. BellSouth employees in the Birmingham, Alabama area are represented at the initial steps of the grievance procedure by CWA Local 3902. (Davis Affidavit, ¶ 2; Baccari Depo., p.5). The collective bargaining agreement provides:

> If an employee is having difficulty during initial job
> specific training, the Company will provide additional
> assistance for up to 3 days depending on the

> employee's progress, the nature of the training and the
> needs of the business.

12.02 F2 (Defendants' Exhibit 1 to Clayton January 23, 1998 Depo.).

In April 1996 the entire department in which Clayton was working was "surplused," Ms. Clayton, because of her seniority, was able to transfer to another position with BellSouth. In May 1996 Ms. Clayton was assigned to a General Clerk position at a BellSouth warehouse facility in Pelham, Alabama. As a result of her physical disability, however, Clayton was under a permanent medical restriction against lifting more than 25 pounds. BellSouth, notified of this restriction, accommodated Clayton by placing her in a Processing Clerk position at a BellSouth facility on Valleydale Road. The Valleydale Road Processing Clerk position did not require Ms. Clayton to lift more than 25 pounds. (Clayton June 23, 1998 Depo., pp.62-63,91-94; Blount Depo., pp.50-55).

Ms. Clayton reported for work at Valleydale Road in her new Processing Clerk job on May 20, 1996. The job required her to use a computer mouse. Ms. Clayton had never used a mouse. Tremors in her hands prevented her from double clicking the mouse in order to make her computer function. (Clayton January 23, 1998 Depo, p.66; Blount Depo, pp.14-16, 31-32). The tremors in her hand are a side effect of medications she takes for her schizophrenia. (Clayton June 23, 1998 Depo., pp. 104, 106-108). For many years plaintiff has been diagnosed as having paranoid schizophrenia. (Clayton January 23, 1998 Depo. at 48; Clayton June 23, 1998 Depo at 9).[2]

---

[2] In an effort to show that defendant BellSouth was aware of her paranoid schizophrenia when she was placed in the processing clerk position, plaintiff submitted an affidavit and exhibits reflecting the following. Plaintiff completed a Physical Background Questionnaire on July 24, 1995 at the direction of Dorris Cunningham, a placement specialist with BellSouth and faxed the questionnaire to Health Services and mailed it to Linda Donka at BellSouth. On the questionnaire, under a section entitled health history plaintiff checked "yes" to mental or emotional disorders. In explaining this answer, plaintiff wrote "I have a disability–It's mental. I'm working under a doctor's care for it. I take four prescriptions everyday–(2 for nerves and 2 for change of life)." Plaintiff also indicated on the questionnaire that she was last seen by a health care provider on "5/25[95] for nerves" and that she had "been in the hospital for [illegible], for having a baby and for mental

On May 20, 1996 Ms. Clayton called Local 3902 President Terry Davis to complain that she was having trouble performing her new job because of the tremors in her hand. She said that she was being intimidated by her supervisor. She told Davis she wanted help learning the job or she wanted a different job. Davis told her that there were no other vacancies, and that she would need to continue training on her new job. (Davis affidavit, ¶ 3). On May 20 Clayton left work to go to the doctor at noon. Apparently she had a panic attack. She was hospitalized until mid-June. Plaintiff received short-term disability benefits during this period. (Clayton January 23, 1998 Depo.; Clayton June 23, 1998 Depo, pp.92-94).

Ms. Clayton contacted Davis again in mid-June. She informed Davis that she was returning to work the following week. She asked Davis for his help in obtaining some accommodation of her hand tremors, or in obtaining another position. Davis told Ms. Clayton that he would come to Valleydale Road to observe her work and to speak to management on her behalf about her training. (Davis Affidavit, ¶ 4; Clayton January 23, 1998 Depo, pp.103-104).

On June 17, 1996 Clayton returned to work. On June 18, 1996 CWA personnel observed Clayton's work on the computer. She complained to them that she had been threatened by her supervisor Charlotte Harrelson. She told them that Harrelson told her she would have three days to learn to use the mouse or she would be terminated. CWA personnel spoke to Harrelson about modifying Clayton's "mouse" so it only needed to be "clicked" once instead of twice and to make sure that she received the time to which she was entitled under the collective bargaining agreement

---

problems. Last September 94 I was out for nerves." On the questionnaire, significantly, plaintiff checked "no" to the following maladies: 20. Hand or Wrist trouble, injury or pain; 24. Pain, Phobias, Panic Attacks; 25. Tremors, Seizures or Convulsions. (See Clayton February 22, 1999 affidavit and exhibits, document #50.) Because defendant BellSouth concedes for purposes of this summary judgment motion that plaintiff was disabled, the above facts are not relevant except arguably to show that BellSouth should not have been aware of a need for accommodation prior to June 17, 1996.

5

to learn how to use the mouse.. Davis also asked Harrelson to "back off" from Clayton because the threats and intimidation only made it harder for her to learn the job. (Davis Affidavit, ¶ 5; Clayton January 23, 1998 Depo, pp.105-107; Blount Depo, pp.74-75).

From June 17 through June 21, 1996, Clayton worked one-half day shifts. Clayton was on vacation from June 24 through 28. The mouse was modified on Friday, June 21, 1996. (Harrelson Affidavit, p.3).[3/] Plaintiff worked full day schedules on July 1, 2 and 3 and all but one hour of a full day schedule on July 8, 1996. (Clayton Affidavit, document #50).[4/]

Near the end of her shift on July 8, 1996 Clayton was placed on lay off status by BellSouth because she was unable to use a mouse as an input device, and because she was not able to learn to use the BellSouth computer program which also required her to use a mouse.[5/] Plaintiff, who was born on February 9, 1941, was fifty-five (55) years old when she was placed on lay off status on July 8, 1996. (See Clayton Affidavit, document #40). Local 3902 Steward Barry Blount, who was a union witness at the meeting in which plaintiff was informed she was being removed from the job, advised Clayton to opt for the "Job Bank," which she did. The "Job Bank" option allowed Clayton to maintain her status as an employee and continue her insurance benefits and also gave CWA time to challenge her removal. The Job Bank option also allowed Clayton the opportunity to

---

[3/] Although plaintiff seeks to dispute this fact, she was unable to testify with certainty when the mouse was modified. She testified she thought it was on or about July 5, that it might have been July 1 but she thought it was July 3 -- "something like that." (Clayton June 23, 1998 Depo, pp.118,181).

[4/] Although in her affidavit Harrelson stated that plaintiff worked July 5th as well (document #29), defendant BellSouth conceded for summary judgment purposes that plaintiff's account of the days and hours she worked is a reasonable one. (Document #56). The court notes that plaintiff's affidavit appears to contain clerical errors because it referred to her work schedule in 1995 when it clearly meant 1996.

[5/] Harrelson explained that plaintiff was "removed from her job as a Processing Clerk because of her inability to learn and perform the duties of that job." Specifically, plaintiff was unable to look up and answer requests, retrieve documents and was further unable to follow prompts on the computer screen or do anything unless she was told exactly what to do. (Harrelson Affidavit).

6

pursue a BellSouth vacancy if one became available. (Davis Affidavit, ¶ 6; Blount Depo, pp.22-24; Belinda Lacey Depo, pp.66-67).

The following day Ms. Clayton went to the Local 3902 hall and filed a grievance alleging that she was improperly removed by BellSouth. Clayton's grievance was then assigned to Local 3902 Departmental Representative Arnold Kinney for processing. (Davis Affidavit ¶ 7 and Exhibit a thereto (Grievance Form); Clayton January 23, 1998 Depo, pp.114-117)

On August 15, 1996 Kinney and Clayton met with management at the "informal" (first) step of the grievance procedure. Kinney argued that Clayton had been unjustly removed from the job because she did not have enough time to learn the job. BellSouth was not prepared to respond to the grievance. CWA then advanced the grievance to the second step of the grievance process without a BellSouth response to the first step proceeding. (Clayton January 23, 1998 Depo, p.131; Exhibit A to Davis Affidavit (Grievance Form) at Line 5).

On September 4, 1996 the grievance was presented at the second step. Kinney made a presentation to the grievance panel arguing that Clayton had not been adequately trained. The panel was unable to reach a consensus on the grievance so it was appealed to the third step. (Clayton January 23, 1998 Depo, pp.131-134; Davis Affidavit, ¶ 8 and Exhibit A thereto (Grievance Form) at Lines 5-8).

Ms. Clayton's discharge grievance was processed at the third step by CWA Representative Jack Baccari. Baccari reviewed the file he received from Local 3902. He set up a meeting with his management counterpart, BellSouth Director of Labor Relations Tom Daigle. BellSouth's position was that they had reconfigured the computer "mouse" to only need a single "click," and that Ms. Clayton had received the training to which she was entitled under the collective

bargaining agreement. Daigle told Baccari that the Company was not willing to reinstate her. (Baccari Depo, pp.5-11). Baccari discussed with Daigle whether there were any equal level job vacancies for which plaintiff was qualified and also asked the Local to investigate whether there were any vacancies; there were none. (Baccari Depo., pp. 5-11; Lacey Aff., p.4).

Based on the information in the grievance file (including a time line of events from Ms. Clayton's arrival at Valleydale Road until her discharge), and discussions with the Local representatives and management, Baccari concluded that CWA could not prevail on Ms. Clayton's grievance before an arbitrator. On November 19, 1996 Baccari wrote to Local President Davis informing Davis that he found "nothing in the file that would give us the necessary ammunition to pursue this case further." He told Davis that without additional information being received within 30 days, he would close the file. He instructed Davis to inform Ms. Clayton. (Baccari Depo., pp.16-17, 21-22, 25-27, 40, 47-48; Davis Affidavit, para. 9 and Ex. B thereto).

Within the thirty day period, Mr. and Ms. Clayton met with Baccari. He told the Claytons that, based upon the information available he could do nothing further. The Claytons offered no additional information. They asked Baccari about obtaining "transitional leave" for Ms. Clayton. Baccari told them that under the collective bargaining agreement a transitional leave was not available to Ms. Clayton, but that he would pursue it with management. (Baccari Depo, pp.27-28; Davis Affidavit, ¶ 10; Clayton January 23, 1998 Depo, pp.139-143).

Baccari called BellSouth Benefits Director John Rigrish to inquire about the possibility of a transitional leave. Rigrish told Baccari that such leave was not available under the collective bargaining agreement. Rigrish stated, however, that if Ms. Clayton offered to settle her discharge grievance in exchange for leave, it would be granted. Baccari then conferred with Daigle and Rigrish

8

about such a settlement. Baccari sent leave application forms to Davis at Local 3902 with instructions that Davis should have Ms. Clayton come to his office to complete the application. Davis contacted Ms. Clayton. When the application was completed, Baccari picked it up from Local 3902 and delivered it to management. On January 17, 1997 Baccari and Daigle formally settled Ms. Clayton's discharge grievance. Ms. Clayton was granted a transitional leave until her twenty year service anniversary date (in September 1997) in order to permit her to obtain a pension at age 55. (Baccari Depo, pp.28-29,58-59; Davis Affidavit, ¶¶ 10-11 and Exhibit A thereto at Lines 11-12, and Exhibit C thereto; Clayton January 23, 1998 Depo, Exhibit 7 (Transitional Leave Authorization.).

Baccari considered this treatment of Clayton by BellSouth "exceptional." (Baccari Depo, pp.56). In his career with CWA Baccari had never before seen the company grant transitional leave outside the collective bargain agreement. This concession to Clayton was acknowledged by Baccari as a financial detriment to BellSouth in that she would become eligible for a pension at age 55 rather than 65 with no corresponding benefit to BellSouth. (Baccari Depo, pp.62,63).

In January 1997 Ms. Clayton applied for Social Security Disability benefits. (Clayton October 23, 1998 Affidavit, document #40). In March 1997 the Social Security Administration determined that Ms. Clayton was disabled and unable to perform gainful employment as of July 8, 1996. She was awarded Social Security Disability benefits retroactive to January, 1997. At the end of her transitional leave, Ms. Clayton applied for and was granted a pension from BellSouth. (Clayton January 23, 1998 Depo, pp.46-47,53-54,146; Clayton June 23, 1998 Depo, pp. 137-138 and Exhibit 4 thereto).

### Claim that CWA failed to fairly represent plaintiff

Plaintiff states:

> The thrust of Clayton's complaint against the Union is that it did not do enough to assist her in obtaining accommodation of her disability. The accommodations Clayton was seeking were: adequate training to learn the computer and telephone interaction aspects of the Valleydale Road Processing Clerk position; modification of her computer "mouse" to only need a single "click;" and a change in her work hours. (Clayton Depo, pp.66-68).

(Plaintiff's response).

It is undisputed that CWA sought and obtained accommodations for plaintiff including a modified mouse and additional training on the computer. Plaintiff testified that she asked BellSouth management for a modification in her work hours and that the company refused. (Clayton January 23, 1998 Depo, pp.71-72). Plaintiff has conceded that she never requested that the CWA attempt to obtain a change in her work hours. (Plaintiff's response, unnumbered p.31). Ms. Clayton did not mention the need for additional telephone training to either BellSouth (Clayton January 23, 1998 Depo., p.69) nor is there any allegation that she made such a request to CWA.

Plaintiff argues that CWA did not pursue whether the requested accommodation was granted or adequate. She notes that the request was made on June 18, 1998 and that the mouse was not modified until July 5, 1996. (Plaintiff's response unnumbered p.21). Plaintiff worked one-half day shifts from June 17 through June 21, 1996. The mouse was modified on June 21, 1996. Plaintiff was on vacation from June 24 through June 28, 1996. Plaintiff returned to work from vacation on July 1, 1996. The actual delay was only three work days, or three one-half day shifts. It is true that Ms. Clayton did not receive immediate benefit of the modified mouse because she was on vacation.

10

Upon returning from vacation, she received four days of training by BellSouth on the modified mouse.

Ms. Clayton further complains that as a consequence of a failure of communication between local and national representatives and Baccari's failure to adequately investigate the timing and effectiveness of the accommodations, Baccari did not present all available arguments. Specifically, Ms. Clayton claims that Baccari never argued that she was not "properly trained" because the mouse was not modified from double click to single click until late June, 1996, rather than in May, 1996 when Ms. Clayton began her new assignment as processing clerk. (Baccari Depo. at p.50,69-75). Nothing in the grievance file provided to Baccari by the local union suggested a problem related to the modification of the mouse. (Baccari Depo at 73-74). The issue was never presented to BellSouth by CWA at the third step of the grievance process. (Baccari Depo at 76). Further, had Baccari learned that the mouse was not modified until June 1996, the fact remains that plaintiff received four days of training after receiving the modified mouse–one day more than required under the collective bargaining agreement.

Plaintiff complains that as a result of the inadequate evidence before him "Baccari decided not to pursue the case to arbitration and closed the file–but not before obtaining, at Ms. Clayton's request, a transitional leave which allowed her to receive a pension at age 55." (Plaintiff's response, unnumbered pp.24-25). She argues that because such a transitional leave was not required and such a settlement was not the way the company usually dealt with employees, "he should have asked Clayton what she thought might motivate such generosity." Of course the notion of transitional leave began with Ms. Clayton herself, not the CWA or BellSouth.

11

Plaintiff also makes the unusual argument that the fact that Baccari obtained transitional leave although such leave was not typical is an indication that the decision in Ms. Clayton's case was discriminatory, arbitrary and made in bad faith warranting judicial review. (Plaintiff's response, unnumbered p.26).

> [i]t is undisputed that Baccari's decision was based on his inadequate review of the information in the file and his miscommunications with the Local and with management. He closed the file without ever even asking why Clayton was unable to use the mouse and without knowing whether or not the requested accommodation had ever been extended to Clayton. Under this theory alone, Baccari's actions in processing Ms. Clayton's grievance constitute a breach of the fair representation duty.

(Plaintiff's response, unnumbered p.28).

The argument is without merit.

To succeed on the claim that CWA failed to fairly represent her, plaintiff "must show that the union's conduct was arbitrary, discriminatory, or in bad faith or that the union discharged its duties in a perfunctory manner." *Hart v. National Homes Corp.*, 668 F.2d 791, 794 (5th Cir. 1982). There is no possible reasonable inference to be drawn from the facts of this case that CWA's conduct was arbitrary and discriminatory or in bad faith. Further, even if CWA's conduct could be described as negligent,[6] "neither negligence on the part of the union nor a mistake in judgment is sufficient to support a claim that the union acted in an arbitrary and perfunctory manner." *Harris v. Schwerman Trucking Co.*, 668 F.2d 1204, 1206 (11th Cir. 1982). Although plaintiff does not specifically allege

---

[6] While this court need not decide whether CWA acted negligently, the court is of the firm opinion that CWA did not act negligently in its representation. Rather, it appears that CWA requested and obtained accommodations for plaintiff, followed the grievance procedure when plaintiff was removed from her job and ultimately obtained a favorable settlement for plaintiff who could have been left pensionless.

12

that CWA acted perfunctorily the Eleventh Circuit has held that "a claim that a union acted 'perfunctorily' requires a demonstration that the union ignored the grievance, inexplicably failed to take some required step, or gave the grievance merely cursory attention." *Harris*, 668 F.2d at 1207. The court in a footnote noted helpful definitions of perfunctorily including "to do it merely to get through or rid of the matter, as a matter of routine and for form's sake only, without interest or zeal" and "without concern or solicitude; indifferent." *Harris*, 668 F.2d 1207, n3. There is no evidence that CWA acted perfunctorily. CWA pursued plaintiff's grievance through step 3 and concluded that the matter should not be pursued to arbitration. After that decision was made, at plaintiff's request, CWA sought and obtained a settlement which permitted plaintiff to obtain a pension at age 55.

CWA is entitled to summary judgment in its favor on plaintiff's claim that CWA failed to provide fair representation.

**Discrimination based on disability**

The ADA mandates that employers shall not discriminate against "a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Plaintiff has the burden of proving a *prima facie* case of disability discrimination by a preponderance of the evidence, which requires a demonstration that she (1) is disabled, (2) is a qualified individual, and (3) was subjected to unlawful discrimination because of her disability. 42 U.S.C. § 12112(a); *see Morisky v. Broward County*, 80 F.3d 445, 447-49 (11th Cir. 1996). A "qualified individual with a disability" is defined by the ADA as an individual with a disability who, with or without reasonable

accommodation, can perform the essential functions of the employment position that such individual holds or desires. 42 U.S.C. § 12111(8).

Defendants concede for purposes of the summary judgment motion that plaintiff is disabled. They argue, however, that she is not "a qualified individual with a disability" under the ADA because she could not perform her job either with or without reasonable accommodation. Plaintiff argues:

> Ultimately, Ms. Clayton was removed from her job by BellSouth because of her inability to perform the essential functions of that job in the absence of a federally mandated accommodation which would have allowed her to perform those functions. BellSouth provided Clayton with less than eight (8) hours of training on the computer after the mouse was modified. Ms. Clayton's discrimination complaint against BellSouth and CWA is that she was denied reasonable accommodation: a functional mouse, additional training, and/or different work hours. To the extent that she was claiming placement, training or scheduling rights in conflict with provisions of the collective bargaining agreement, BellSouth was under a legal obligation, as referenced within the technical assistance provided by the EEOC, to provide them. BellSouth and CWA's obligation to Ms. Clayton was to see that her disability was reasonably accommodated consistent with the provisions of the ADA. That simply was not done.
>
> There is ample evidence that Ms. Clayton was denied the three days additional training required by Article 12.02(F)2, and that she was denied any available work schedule accommodation (about which she never even spoke to the Union). The evidence is certainly clear that BellSouth failed and refused to make her mouse accessible to her. Thus, she has established that she

>was discriminated against and unreasonably denied accommodation.

(Plaintiff's response, unnumbered pp.31-32).

Plaintiff was not entitled to the accommodation of her choice but only to a reasonable accommodation. *Stewart v. Happy Herman's Chesire Bridge, Inc.*, 117 F.3d 1278, 1286 (11th Cir. 1997); *Terrell v. USAir*, 132 F.3d 621, 626 (11th Cir. 1998). The duty to provide a reasonable accommodation is not triggered unless a specific demand for accommodation has been made. *Gaston v. Bellingrath Gardens and Home, Inc.*, 167 F.3d 1361 (11th Cir. 1999). It was plaintiff's burden to identify an accommodation. *Stewart, supra.* "Whether an accommodation is reasonable depends on specific circumstances." *Terrell v. USAir, supra.* When plaintiff complained that she could not double click the mouse, the mouse was modified to single click. Plaintiff concedes that the mouse was modified. She admits that it worked. (Plaintiff's response, p.22, n.5). Plaintiff never requested additional telephone training of BellSouth (Clayton January 23, 1998 Depo, pp.68-69), nor apparently did she mention the need for such to CWA officials when they observed plaintiff at her work place and met with management to suggest accommodations. While plaintiff asked BellSouth to modify her work hours so that she would handle calls alone for the thirty minutes at the end of the day, (Clayton January 23, 1998 Depo., pp.71-73), she concedes that this was never mentioned to CWA as a needed accommodation. (Plaintiff's response, unnumbered p.31). Plaintiff has failed to allege how a modification in her work hours would have enabled her to perform the essential functions of processing clerk. Moreover, plaintiff received the additional training required by the collective bargaining agreement. To the extent that plaintiff contends that the ADA required defendants to

ignore or violate the collective bargaining agreement in an effort to accommodate plaintiff, this contention is without merit. *See Duckett v. Dunlop Tire Corp.,* 120 F.3d 1222, 1225 (11th Cir. 1997).

The court concludes that the accommodations sought by CWA and provided by BellSouth were reasonable, that CWA and BellSouth were not required to do more, and that plaintiff was unable, despite the reasonable accommodations made to perform the essential functions of processing clerk.

### Discrimination based on age and gender

In plaintiff's response she argues:

> For the same reasons that the record of this case supports a claim that CWA breached the duty of fair representation, it supports Clayton's claim that CWA discriminated against Ms. Clayton because of her disability, gender and her age. There is evidence that the actions taken by Local 3902 and CWA were outside the scope of what Representative Baccari considered reasonable. There is evidence that he knew of her physical limitations and her request for accommodation, and that he willfully and recklessly refused to argue those issues, because to him they were not issues in this matter. The record reflects the exact type and kind of discrimination that the ADA was drafted to avoid, and it is bolstered by the fact that it occurred with regard to an older female employee in a technology company which is dominated by men.

(Plaintiff's response, unnumbered pp.30-31).

Plaintiff apparently attempts to portray BellSouth's willingness to settle her termination grievance and provide plaintiff with transitional leave which allowed her to draw a pension at age 55 as a devious attempt to conceal discrimination based on disability, age or gender. There is, however, no evidence whatsoever of any discrimination based on plaintiff's disability, age

16

or gender. In the absence of any specific evidence, the conclusory allegation that plaintiff was "an older female employee in a technology company which is dominated by men" is insufficient to establish a *prima facie* case of sex or age discrimination.[2/] Defendants CWA and BellSouth are entitled to summary judgment on all claims of discrimination.

Based on the foregoing the defendants' motions for summary judgment (documents #21 and #23) are due to be and the same are GRANTED. A judgment consistent with this Memorandum of Decision will be entered.

As to the foregoing it is SO ORDERED this the 19th day of January, 2000.

                                                                             _____
                                                                             PAUL W. GREENE
                                                                             UNITED STATES MAGISTRATE JUDGE

---

[2/]   Plaintiff has failed to present either direct evidence of discrimination or evidence that would establish an inference of discrimination.